O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DOMINQUE M. BELTON,     )   Case No.: ED CV 16-02165-JDE
                             )
            Plaintiff,     )   MEMORANDUM OPINION
    v.                        )   AND ORDER
                             )
NANCY A. BERRYHILL,        )
Acting Commissioner of Soc. Sec.,   )
                             )
           Defendant.    )
_____ )

## I.

## INTRODUCTION

Plaintiff Dominique M. Belton filed a Complaint on October 13, 2016 seeking review of the Commissioner's denial of her application for Title XVI Supplemental Security Income ("SSI") benefits. (Dkt. No. 1; see also AR 11.) Defendant filed an Answer to Plaintiff's Complaint on February 27, 2017. (Dkt. No. 15.) All parties have consented to proceed, pursuant to 28 U.S.C. § 636(c), before the undersigned United States Magistrate Judge for all further proceedings, including entry of Judgment. (See Dkt. Nos. 11, 12, 13.) On May 12, 2017, the

parties filed a "Joint Submission" (Dkt. No. 21); and on May 22, 2017, the parties filed an "Amended Joint Submission" (Dkt. No. 22); and this Court construes the Amended Joint Submission to be the current pleading of record and to supersede the earlier-filed Joint Submission.[1]

## II.
## BACKGROUND

### A.  Administrative Proceedings

On April 30, 2013, Plaintiff filed her application for SSI benefits, alleging a disability onset date of May 10, 2011. (AR 11, 30.) Plaintiff claims that she cannot work due to bipolar disorder, schizophrenia, depression, stress, anxiety, and hallucinations. (See AR 16, 205.) Plaintiff alleges that she has not worked since April 30, 2013, the date of her application. (See AR 13.)

Plaintiff was born on March 20, 1985, and at the time she filed her benefits application she was 28 years old, a "younger individual" for disability purposes. (See AR 21, 36, 165.) She is 5' 6" tall and weighs 210 pounds, which qualifies as obese for Social Security purposes. (See AR 13.)  She is a high school graduate and is able to communicate in English. (See AR 21, 36.) Plaintiff lives in an apartment with her mother and brother. (See AR 14, 47-48, 350.) Plaintiff has two older children who were apparently taken from her custody and placed in foster care. (See AR 32, 54.) Plaintiff also became pregnant in 2014, and had a baby son who was born on October 16, 2014. (See AR 17, 41, 54.) Plaintiff was incarcerated from early 2012 until April 2013. (See AR 46, 50.)

---

[1] Defendant explains that due to word processing compatibility problems, the pages of the Amended Joint Submission contain separate submissions from Plaintiff and Defendant, but the separate submissions are not consecutively numbered. Accordingly, the Court will refer to Plaintiff's submission as "Pl.'s Am. J. Subm." and to Defendant's submission as "Def.'s Am. J. Subm.," and refer to the page numbers assigned by the parties to their separate submissions.

Plaintiff previously worked for short periods as a sales attendant at a retail "Navy Exchange" outlet, and as a food delivery driver for Pizza Hut, both unskilled positions. (See AR 20-21, 36-38, 56.)

Plaintiff has been diagnosed with a variety of mental disorders, including major depression with psychotic features, anxiety disorder, and polysubstance abuse. (See AR 18, citing Exh. 1F [AR 290-303] and Exh. 6F at 8 [AR 347].) In April 2012, while Plaintiff was incarcerated, Plaintiff was sent to an outside hospital because of mental symptoms and suicidal ideations. (See AR 18, 51-54.) The record also reflects that Plaintiff has been treated for hypothyroidism and diabetes. (See AR 13, citing Exh. 2F at 7, Exh. 7F at 4.)

On December 4, 2014, Plaintiff and a vocational expert ("VE") testified at a hearing before an Administrative Law Judge ("ALJ"). (See AR 27-66; see also AR 11.) Plaintiff testified that, while she had been taking medications for her mental conditions, she stopped when she became pregnant in February 2014, but re-started again in October 2014 after her baby son was born. (See AR 40-42.) Plaintiff testified that she took Zoloft, Abilify, Haldol, Wellbutrin, Prazosin, Metformin for diabetes, and thyroid medication. (AR 42-43.) She denied side effects from the medications, but said she has "drowsiness and . . . a little bit of weight gain." (AR 43.)

Plaintiff testified that she has a learning disability, and can only read at a 5th grade level. (AR 43-44.) However, Plaintiff testified that she uses a computer at a library. (AR 44.) Plaintiff testified that she can do cleaning around the house "when it's once I'm not like depressed." (AR 48.) She acknowledged that she is able to go the store, but her brother walks with her and she does not go alone. (AR 48-49.) Plaintiff testified that she takes care of her infant son, "but sometimes my Mom has to take him away from me because I get so stressed out." (AR 54.)

Plaintiff testified she doesn't think she could handle a repetitive 9 to 5 job because "I'd probably get so stressed out that I probably won't go in no more."

(AR 51.) However, Plaintiff did think she was smart enough and had the physical ability to perform a simple job like "put[ting] . . . paper cups in bags," but she thought her performance would be slowed down "because of what's going on in [her] head." (AR 52.)

The ALJ gave the VE a hypothetical at the hearing for a person "limited to work involving simple, repetitive tasks . . . no more than occasional contact with co-workers and no contact with the public." (AR 56.) The VE opined that Plaintiff could not do her past relevant work with those limitations because of the limitation on "no public contact." (AR 56-57.) However, the VE opined that Plaintiff could still do three other jobs that existed in significant numbers in the national economy: (1) laundry worker, Dictionary of Occupational Titles ("DOT") code no. 922.687-058, 378,000 jobs nationally; (2) warehouse worker, DOT no. 922.687-058, 378,000 jobs nationally; and (3) hand packer, DOT no. 920.587-018, 410,000 jobs nationally. (AR 57.)

**B.    Summary of Administrative Decision, Appeals Council Review**

On April 2, 2015, the ALJ issued a decision denying Plaintiff's Title XVI SSI benefits application. (See AR 22.)

The ALJ found that Plaintiff had three impairments that qualified as "severe": (1) bipolar disorder with psychotic features, (2) anxiety disorder, and (3) a history of polysubstance abuse. (See AR 13.) The ALJ also noted Plaintiff's history of obesity, hypothyroidism, and diabetes, but he found that none of those conditions were severe. (AR 13-14.)

The ALJ found that Plaintiff did not meet or equal any of the listed impairments set forth at 20 C.F.R. Par 404, Subpart P, Appendix 1. (AR 14.) The ALJ found that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in social functioning; and moderate difficulties with concentration, persistence, or pace. (AR 14-15.) The ALJ went on to find that Plaintiff retained the residual functional capacity ("RFC") to perform "a full range of work at all

4

exertional levels," but the ALJ found that Plaintiff also had "nonexertional limitations" that limited her to work involving "simple repetitive tasks," with no more than occasional contact with coworkers, and no contact with the public. (See AR 15.) The ALJ also found that the Plaintiff's activities of daily living were inconsistent with her testimony at the hearing, and demonstrated that she retained the capacity for work. (See AR 17-18.)

The ALJ found that Plaintiff was unable to perform any of her past relevant work. (AR 20.) However, based on the testimony from the vocational expert at the hearing, the ALJ found that, in light of Plaintiff's RFC and her age, education, and work experience, Plaintiff could still do the three jobs identified by the VE, that is, (1) laundry worker, (2) warehouse worker, or (3) hand packer.

Accordingly, the ALJ denied Plaintiff's SSI application at step five of the sequential evaluation, finding that Plaintiff had not been under a disability from April 30, 2013, the date the application was filed, through April 2, 2015, the date of the ALJ's decision. (See AR 21-22.)

On April 20, 2015, Plaintiff requested review by the Social Security Administration Appeals Council of the ALJ's denial of Plaintiff's application. (See AR 5-7.) Plaintiff apparently did not submit any new evidence to the Appeals Council's for further consideration at that time. (See id.)

On August 16, 2016, the Appeals Council issued a notice stating that it found no reason to review the ALJ's decision and denying Plaintiff's request for review. (AR 1-3.) Accordingly, the ALJ's April 2, 2015 unfavorable decision became the final decision of the Commissioner.

## III.

## STANDARD OF REVIEW

The issue in Social Security disability cases is whether the claimant is "disabled" under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of

any medically determinable impairment or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 423(d)(1)(A); Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).

**A.     Five-Step Sequential Evaluation**

When the claimant's case has proceeded to consideration by an ALJ, the ALJ conducts a five-step sequential evaluation to determine at each step if the claimant is or is not disabled. See Molina, 674 F.3d at 1110 (citing, inter alia, 20 C.F.R. §§ 404.1520(a), 416.920(a)).

First, the ALJ considers whether the claimant currently works at a job that meets the criteria for "substantial gainful activity." Id. If not, the ALJ proceeds to a second step to determine whether the claimant has a "severe" medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months. Id. If so, the ALJ proceeds to a third step to determine whether the claimant's impairments render the claimant disabled because they "meet or equal" any of the "listed impairments" set forth in the Social Security regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1. See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1001 (9th Cir. 2015).

If the claimant's impairments do not meet or equal a "listed impairment," before proceeding to the fourth step the ALJ assesses the claimant's RFC, that is, what the claimant can do on a sustained basis despite the limitations from her or his impairments. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Social Security Ruling ("SSR") 96-8p. After determining the claimant's RFC, the ALJ proceeds to the fourth step and determines whether the claimant has the RFC to perform her past relevant work, either as she "actually" performed it when she worked in the past, or as that same job is "generally" performed in the national economy. See Stacy v. Colvin, 825 F.3d 563, 569 (9th Cir. 2016) (citing, inter alia, SSR 82-61); see also 20 C.F.R. §§ 404.1560(b), 416.960(b).

If the claimant cannot perform her past relevant work, the ALJ proceeds to a fifth and final step to determine whether there is any other work, in light of the claimant's RFC, age, education, and work experience, that the claimant can perform and that exists in "significant numbers" in either the national or regional economies. See 20 C.F.R. §§ 404.1520(g), 416.920(g); Tackett v. Apfel, 180 F.3d 1094, 1100-01 (9th Cir. 1999). If the claimant can do other work, she is not disabled; but if the claimant cannot do other work and meets the duration requirement, the claimant is disabled. See Tackett, 180 F.3d at 1099 (citing 20 C.F.R. § 404.1560(b)(3)); see also 20 C.F.R. § 416.960(b)(3).

The claimant generally bears the burden at each of steps one through four to show that she is disabled, or that she meets the requirements to proceed to the next step; and the claimant bears the ultimate burden to show that she is disabled. See, e.g., Molina, 674 F.3d at 1110; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). However, at step five, the ALJ has a "limited" burden of production to identify representative jobs that the claimant can perform and that exist in "significant" numbers in the economy. See 20 C.F.R. §§ 404.1560(c)(1)-(2), 416.960(c)(1)-(2); Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012); Tackett, 180 F.3d at 1100.

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision denying benefits to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence" is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 522-23 (9th Cir. 2014) (citations and internal punctuation omitted).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). Although this Court cannot substitute its discretion for

7

the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." Molina, 674 F.3d at 1110. See also Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (court will uphold Commissioner's decision when evidence is susceptible to more than one rational interpretation). However, the Court may only review the reasons provided by the ALJ in the disability determination, and may not affirm the ALJ on a ground upon which the ALJ did not rely. Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir. 2014) (citation omitted); see also Orn, 495 F.3d at 630 (citation omitted).

Overall, the standard of review of an ALJ's decision is "highly deferential." Rounds, 807 F.3d at 1002 (citing Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009)).

Lastly, even when an ALJ has committed a legal error, a reviewing court will still uphold the ALJ's decision if the error was harmless, that is, if it was inconsequential to the ultimate nondisability determination, or where, despite the error, the Agency's path "may reasonably be discerned," even if the Agency has explained its decision "with less than ideal clarity." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citations and internal punctuation omitted).

## IV.

## DISCUSSION

### A.    Disputed Issues

The "Amended Joint Submission" presents three disputed issues:

1.    Whether the ALJ properly considered the relevant medical evidence of record in assessing Plaintiff's RFC;

2. Whether the ALJ properly considered Plaintiff's subjective statements of record and testimony under oath in assessing her credibility; and

3. Whether the ALJ's conclusion at step five of the five-step sequential evaluation in relying on the VE's numbers on other jobs available in the national economy are correct, is supported by substantial evidence. (Am. J. Subm. at 3.)

**B.    Issue No. 1: Medical Records and Residual Functional Capacity**

In the first disputed issue, Plaintiff argues that the ALJ "cherry-picked" portions of reports from reviewing, non-examining State Agency physicians, and did not properly analyze and credit the opinions from the various treating and consulting physicians in the record who found that Plaintiff would be unable to complete a 40-hour workweek at any job. (See Pl.'s Am. J. Subm. at 4-6.) In particular, Plaintiff faults the ALJ's reliance on opinions from the reviewing, non-examining State Agency psychologists to which the ALJ gave "great weight," while the ALJ gave "little weight" to the opinions of Plaintiff's treating physicians at the Riverside County Department of Mental Health, and ostensibly gave "little weight" to an opinion from a consultative examining psychiatrist. (See id.)

Plaintiff also complains that the ALJ's opinion does not address the finding from reviewing, non-examining State Agency physician Dr. Alan Berkowitz that Plaintiff is only "capable of . . . carrying out simple one- to two-step unskilled tasks." (Pl.'s Am. J. Subm. at 5, citing AR 93.) Plaintiff maintains, without citing any authority, that "the limitation to one- to two-step tasks set forth by the State Agency reviewing physician is not necessarily consistent with the limitation in the ALJ's residual functional capacity to 'simple repetitive tasks.'" (Id. at 6.)

1. Applicable Federal Law

In evaluating physicians' opinions, the case law and the regulations distinguish among three types of doctors: (1) those who treat the claimant (i.e., treating physicians); (2) those who see the claimant in person and perform a consultative examination but do not treat the claimant (examining or consultative

physicians); and (3) those who neither treat nor examine the claimant, usually only reviewing records (reviewing, non-examining physicians). <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995); <u>see also</u> 20 C.F.R. §§ 416.902, 416.927(d).  As a general rule, more weight should be given to the opinion of a treating source than to the opinions of doctors who did not treat the claimant. <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987); <u>see also</u> 20 C.F.R. § 416.927(d)(2).

A treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability, and an ALJ may disregard a treating physician's opinion whether or not that opinion is contradicted. <u>See</u> <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). Where a treating physician's opinion is not contradicted, an ALJ may reject that opinion only with "clear and convincing" reasons supported by substantial evidence in the record. <u>See</u> <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998) (quoting <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993)); <u>see also</u> <u>Magallanes</u>, 881 F.2d at 751. Where the opinion of a claimant's treating physician is contradicted, and the opinion of a non-treating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the non-treating source may itself be substantial evidence, and it is then solely the province of the ALJ to resolve the conflict. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing <u>Magallanes</u>). Where, on the other hand, a non-treating source's opinion is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives "specific and legitimate" reasons based on substantial evidence in the record. <u>Id.</u>; <u>see also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002).

2.      <u>Further Background, Analysis</u>

Plaintiff was seen and treated numerous times at the Riverside County Department of Mental Health ("RCDMH") from May 6, 2013 through February

18, 2014. (AR 341-423.) Plaintiff apparently had a session scheduled on April 8, 2014, but did not attend. (See AR 425-26.) As the ALJ noted, Dr. Staci Johnson was apparently one of Plaintiff's treating physicians at RCDMH, and various other "psychiatric practitioners" treated Plaintiff at RCDMH as well. (See, e.g., AR 19, 355, 357, 409-10, 412-13, 417-18, 421-23, 425.)

On August 11, 2013, a complete psychiatric evaluation was performed on Plaintiff by consultative examining psychiatrist Dr. Sohini Parikh. (See AR 332-39 [Exh. 5F 1-8.) On August 30, 2013, as part of the disability determination at the initial level, State Agency reviewing physician Dr. Chan-Wuk Kang completed a "Disability Determination Explanation." (AR 67-79 [Exh. 1A 1-13].) On October 29, 2013, as part of the disability determination at the reconsideration level, State Agency reviewing physician Dr. Alan Berkowitz completed a "Disability Determination Explanation." (AR 81-95 [Exh. 3A 1-15].)

The ALJ stated that in determining Plaintiff's RFC, he gave "great weight" to the opinions of the State Agency physicians, whom he describes as "psychologists." (See AR 18, citing Exhs. 1A and 3A.) The ALJ noted that these psychologists found that Plaintiff would be limited to "work involving simple repetitive tasks," which the ALJ found "reasonable and supported by the record as a whole." (AR 18.) The ALJ also noted that the examining psychiatrist, Dr. Parikh, found that, while Plaintiff suffered from "mood disorder, bipolar disorder, and polysubstance abuse," Dr. Parikh found that from "a psychiatric standpoint" Plaintiff "had no more than mild mental limitations." (AR 18, citing Exh. 5F.) However, while the ALJ said he agreed with Dr. Parikh that "claimant is not disabled because of her mental impairments," he gave "little weight" to Dr. Parikh's opinion because it did not include evidence that was received after her examination of Plaintiff, and did not include Plaintiff's testimony at the hearing before the ALJ, all of which the ALJ found showed that mental impairments had more than a "minimal" effect on Plaintiff's ability to work. (AR 19.)

Nevertheless, the ALJ gave "little weight" to the opinions of Dr. Johnson and the providers at RCMDH because (1) the opinions were conclusory; (2) treatment notes during the relevant period documented normal findings; (3) Dr. Johnson's own personal examinations of Plaintiff were "minimal"; and (4) the reports from the providers at RCDMH were internally inconsistent, and in numerous instances suggested "normal" findings. (See AR 19.)

The ALJ also gave "little weight" to the letter and the function report submitted by Plaintiff's younger brother, James Phillips Diggs. (AR 19-20, citing AR 191-92 [Exh. 1E 1-2] and AR 214-22 [Exh. 5E 1-9].) Among other things, the ALJ found Mr. Diggs' submissions to be inconsistent with Plaintiff's admitted activities, such as her ability to do some household chores, an ability which she admitted to the consultative examiner Dr. Parikh. (AR 20, citing AR 335.)

The ALJ also found that the various GAF scores in the record were "inconsistent with the treatment notes from that same time and the generally benign findings from [the] mental status examinations" of Dr. Parikh and the State Agency psychologists.[2] (AR 20.)

While the Court agrees with the thrust of Plaintiff's criticism that the ALJ's reasoning is succinct, the Court finds that the ALJ's analysis is nevertheless supported by substantial evidence, and specific and legitimate enough to discount the contrary opinions from the treating providers. In particular, the records from Dr. Johnson are indeed minimal, a number of them are conclusory, and many document only normal findings which contradict Plaintiff's intermittent

---

[2] A "GAF" or "Global Assessment of Functioning" score is a rough, subjective estimate of an individual's psychological, social, and occupational functioning, and is used to reflect the individual's need for treatment. See Vargas. v. Lambert, 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998). GAF is scored on a scale of 0 to 100, with "1" being the lowest possible score, representing severe mental health problems, and "100" being the highest, representing "no symptoms" and "superior functioning in a wide range of activities." See Vasquez v. Astrue, 572 F.3d 586, 594-97 (9th Cir. 2009) (discussing GAF and DSM-IV).

complaints of severe impairment. For example, the "narrative reports" which the ALJ attributes to Dr. Johnson (see AR 342, 397), and which state that Plaintiff cannot complete a 40-hour workweek without decompensating, are indeed conclusory, check-the-box style forms, and therefore may legitimately be rejected. See Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may properly reject check-off report that did not explain reasons for conclusions). As the ALJ stated, numerous treatment notes, including "mental status exams," document "normal" thought processes and findings, or Plaintiff reporting that she is "okay," throughout the relevant period of claimed disability here. (See, e.g., AR 308 [psychiatric evaluation showing generally "normal" findings]; AR 349 [some normal findings in mental status exam]; AR 355 [Plaintiff reports she is "ok" and having fair response to medications]; AR 394 ["able to manage daily activities"]; AR 422 [Plaintiff "states that she is 'ok' reports stopping her medications" and "able to manage daily activities"]. An ALJ may properly reject the opinions of treating providers where records reveal such inconsistencies. See, e.g., Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) ("conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider" (citations omitted)).

Likewise, as discussed more fully below in regard to Plaintiff's credibility, the ALJ properly noted that Plaintiff's many statements in the record about her ability to perform daily activities conflicted with her brother's opinion of her limitations, and the ALJ's reliance on those conflicts was a legitimate reason to reject the brother's opinion. See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007) (ALJ may reject third party's testimony upon giving reason germane to that witness). Similarly, the ALJ legitimately rejected Plaintiff's GAF scores for being

13

inconsistent with the treatment notes that reflected a range of GAF scores and showed occasional benign findings. See, e.g., Duran v. Berryhill, No. CV 16-7416-JPR, 2017 WL 2588069, at *8 (C.D. Cal. June 14, 2017) (unpublished) (ALJ may disregard doctor's GAF finding when inconsistent with record as a whole).

Taken together, the ALJ's reasons for rejecting the opinions of the treating providers are sufficiently specific and legitimate. See Molina, 674 F.3d at 1110; Burch, 400 F.3d at 679.

Lastly, Plaintiff's argument that the finding from one of the State Agency reviewing psychologists, Dr. Berkowitz, that Plaintiff would be limited to "carrying out one to two step unskilled tasks" (see AR 93) is inconsistent with the ALJ's RFC assessment that found a limitation to "simple repetitive tasks," is unavailing. Plaintiff cites no case authority in support of this argument, but the Court construes it as an argument that the reasoning level posited by the ALJ may be beyond the reasoning level that Dr. Berkowitz found for Plaintiff. See, e.g., Rounds, 807 F.3d at 1002-03 (analyzing whether limitation to "one to two step tasks" matched "Level 1" reasoning set out in Dictionary of Occupational Titles job descriptions); see also Dictionary of Occupational Titles, "Appendix C – Components of the Definition Trailer" (1991 Westlaw 688702). However, the Court notes that the "laundry worker" job only requires "Level 1" reasoning, where the worker will "[a]pply commonsense understanding to carry out simple one- or two-step instructions." See DOT no. 361.687-018. "Level 1" is the lowest reasoning level possible for any job described in the DOT. The other two jobs, "warehouse worker," DOT no. 922.687-058, and "hand packer," DOT no. 920.587-018, both require Level 2 reasoning. Therefore, since the laundry worker job only requires the lowest level of reasoning and includes the ability to carry out one- or two-step instructions, the issue of whether "Level 2" reasoning for the other two jobs requires more than the ability posited by Dr. Berkowitz is irrelevant. In other words, it is not necessary to decide whether the "Level 2"

14

reasoning required for the other two jobs is beyond the limitation to one- to two-step instructions because, even if it was, any error would be harmless because the laundry worker job only requires Level 1 reasoning.

**C.    Issue No. 2: Analysis of Plaintiff's Credibility**

In disputed issue number 2, Plaintiff argues that the ALJ improperly discounted Plaintiff's credibility in a brief analysis that was not sufficiently specific and did not provide "clear and convincing" reasons. (See Pl.'s Am. J. Subm. at 6-9.) Plaintiff argues that the ALJ unfairly found that Plaintiff was not credible because: (1) her activities of daily living are consistent with work demands; (2) she has received minimal medical treatment; (3) the objective evidence does not support her subjective complaints; and (4) Plaintiff was non-compliant and not taking her medications for a period of three months. (See id. at 8.) In particular, Plaintiff faults the ALJ's analysis of her activities of daily living, and states that "she has readily admitted and acknowledged that there are days in which she can perform certain activities while on other days she is not capable of performing activities of daily living or work-related functioning." (Id. at 9.) Plaintiff also complains that the ALJ is unfairly penalizing her for being "off of her medications," and says that she "had in fact been trying to get her prescriptions refilled but that for some reason apparently had difficulty in doing so." (Id. at 8.) Plaintiff argues that, because the ALJ does not accuse her of malingering or inappropriately magnifying her symptoms, his analysis of her credibility is not supported by sufficiently "clear and convincing" reasons. (Id.)

1.    Applicable Law

The ALJ must make two findings before the ALJ can find a claimant's pain or symptom testimony is not credible. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (citing 42 U.S.C. § 423(d)(5)(A)). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be

15

expected to produce the pain or other symptoms alleged." Id. As long as the plaintiff offers evidence of a medical impairment that could reasonably be expected to produce pain or symptoms, the ALJ may not require the degree of pain or symptoms to be corroborated by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991). Second, if the claimant has produced such evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide "'specific, clear and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms.'" Treichler, 775 F.3d at 1102 (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)).

An ALJ's assessment of credibility should normally be given great weight, and where an ALJ's credibility finding is supported by substantial evidence, a reviewing court may not engage in second-guessing. See Thomas, 278 F.3d at 959; Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985). Furthermore, "[a]n ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking . . .." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (citing 42 U.S.C. § 423(d)(5)).

When analyzing a claimant's subjective pain symptoms, the ALJ may consider factors relevant to the symptoms such as, inter alia, the claimant's daily activities; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment, other than medication, that the claimant receives or has received for relief of pain or other symptoms; or any other measures that the claimant has used to relieve pain or symptoms. See 20 C.F.R. § 416.929. The ALJ may employ "ordinary techniques of credibility evaluation," such as prior inconsistent statements concerning symptoms, testimony that appears less than candid, or unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, in assessing a claimant's credibility. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)

(citations omitted); see also Thomas, 278 F.3d at 958-59 (in analyzing credibility of claimant's pain complaints, ALJ may consider reputation for truthfulness, inconsistencies between testimony and conduct, work record); Fair, 885 F.2d at 603 (in analyzing claimant's pain and symptoms, ALJ may consider evidence of daily activities, inadequately-explained failure to seek treatment or follow prescribed treatment). In addition, the ALJ may consider testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms about which the claimant complains. See Thomas, 278 F.3d at 958-59 (citing Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)).

Once a claimant has presented medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony regarding subjective pain and other symptoms merely because the symptoms, as opposed to the impairments, are unsupported by objective medical evidence. Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). Nevertheless, "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

2.   ALJ's Opinion and Analysis

In assessing Plaintiff's daily living activities, the ALJ noted that in her function report Plaintiff "admitted that she performed some chores, folded clothes, shopped, watched movies, and attended church." (AR 14, citing AR 264-71 [Exh. 11E 1-8].) The ALJ also noted that treating providers observed that Plaintiff's activities of daily living were "good" or "appropriate." (AR 14, citing AR 372, 390.) The ALJ also noted that Plaintiff was enrolled in culinary school at one time, and attested that she took care of her ill mother. (AR 14, citing AR 394.) The ALJ also noted that Plaintiff admitted at the hearing that she sometimes used a

17

computer at a library. (AR 16; see AR 44.) The ALJ found that Plaintiff's admissions were "contradictory" to her claims of impairment. (AR 16.)

The ALJ found that Plaintiff's asserted symptoms and limitations were "only partially credible" (AR 16), noting that Plaintiff told the consultative examiner Dr. Parikh that she "performed personal care tasks, managed her transportation, performed chores, got along with others, was able to focus, and had no difficulty making decisions." (AR 17; see AR 335.) The ALJ also noted that Plaintiff had received "minimal psychiatric care" since she became pregnant in February 2014. (AR 17.) The ALJ opined that "the lack of emergency room visits, psychiatric hospitalization, or frequent psychiatric outpatient visits since 2014 is evidence that the claimant's mental condition is not as severe as she alleges." (AR 17.) The ALJ also noted that Plaintiff denied any psychiatric problems in May 2013 (AR 311), and said she was "doing well" in December 2013 (AR 390). (AR 17.) The ALJ also stated that, although it was not the "primary basis" for his decision, the three-month period where Plaintiff apparently went without prescription medications at the start of her most-recent pregnancy demonstrated "a possible unwillingness to do what is necessary to improve her condition." (AR 17, citing 20 C.F.R. § 416.930.) The ALJ also noted that "the claimant's . . . allegations of an inability to perform any substantial gainful activity during the relevant period are considerably inconsistent." (AR 17-18.)

The Court finds that the ALJ's reasons for finding Plaintiff only "partially credible" are sufficiently specific, clear, and convincing enough to support his determination. As noted above, the record is replete with Plaintiff's contradictory reports to providers and examiners, sometimes complaining of debilitating mental symptoms and an inability to perform activities of daily living, and at other times stating that she felt "okay" and reporting that she could manage activities of daily living. The Court also notes the minimal records from February 2014 onward, after Plaintiff became pregnant, as the ALJ noted. In particular, a record dated

18

February 18, 2014 from RCDMH reflects that Plaintiff denied "sleep/appetite/ mood/perceptual disturbances," acknowledged that she was stopping her medications after becoming pregnant, and stated that she was "able to manage daily activities." (AR 422.) The last progress note in the record from April 8, 2014 notes that Plaintiff did not show up for the session scheduled for that day. (AR 425.) Taken together, the Court finds that the ALJ's credibility determination is supported by substantial evidence in the record and is therefore not subject to reversal here. See Thomas, 278 F.3d at 959; Nyman, 779 F.2d at 531.

**D.** **Issue No. 3: ALJ's Acceptance of the VE's Job Numbers**

Lastly, in disputed issue number 3, Plaintiff argues that the national job numbers for the three jobs that the VE testified Plaintiff could still do in spite of her limitations are inaccurate and cannot constitute "substantial evidence" to support the step five denial. (See Pl.'s Am. J. Subm. at 10.) Plaintiff argues that the VE's figures include a number of part-time jobs that should not be included in the VE's numbers, and Plaintiff argues that the jobs cited by the VE also include various sub-categories of jobs that cannot apply to Plaintiff. (See Def.'s Am. J. Subm. at 10-12.) Plaintiff has attached to the Amended Joint Submission three exhibits, corresponding to each of the three jobs identified by the VE at the hearing, and those exhibits are apparently printouts from a "Skilltran" website where a program called "Job Browser Pro" generates information on DOT job descriptions. (See Pl.'s Am. J. Subm. at 10-12, citing "http://www.skilltran.com" and Exhs. A, B, and C to Am. J. Subm.)

Defendant argues that the VE's expertise provides the necessary foundation for his testimony, and therefore no additional foundation is required. (Def.'s Am. J. Subm. at 4, citing Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).) Defendant also argues that the Agency may only take "administrative notice" of "reliable" job information from such sources as the U.S. Department of Labor, the Dictionary of Occupational Titles, or from a vocational expert. (See Def.'s Am. J.

Subm. at 5, citing 20 C.F.R. §§ 404.1566(d), 416.966(d).) Defendant asserts that Plaintiff's "ex post facto" objection to the VE's jobs numbers cannot establish reversible error, and Defendant cites Gutierrez v. Comm'r, 740 F.3d 519, 527 (9th Cir. 2014), for the proposition that "a claimant waives his right to challenge a vocational expert's testimony regarding the number of jobs available if the issue is not raised at the hearing." (Def.'s Am. J. Subm. at 5.)

       1.   Applicable Law, Analysis

     At the threshold, the Court notes that Plaintiff apparently raises this issue no. 3 and submits her supporting exhibits for the first time in the disability application process to this District Court. The record reflects that Plaintiff's attorney at the hearing made no mention of any objection to the VE's job numbers at the hearing (see AR 56-66), and likewise Plaintiff apparently did not submit these proposed new job numbers and supporting exhibits when she requested that the Appeals Council review the ALJ's denial. (See AR 1-7.) Accordingly, the proposed exhibits are not part of the record that this District Court may review here, and those exhibits may only be reviewed by the Agency if this Court decides that remand is warranted. See Atkinson v. Colvin, No. 1:14-CV-01268-AC, 2015 WL 5330794, at *9 (D. Or. Sept. 9, 2015) (additional evidence that claimant submitted to District Court after Appeals Council denied review of ALJ's decision is not part of administrative record (citing Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th Cir. 2012)).

     However, contrary to Defendant's argument, a claimant has not necessarily "waived" consideration of new issues or new evidence that were not presented to the ALJ or to the Appeals Council but are presented to the District Court for the first time on appeal. See, e.g. Sims v. Apfel, 530 U.S. 103, 105 (2000) (holding that "administrative exhaustion" requirement for district court review of denied application only requires presentation of request for review of ALJ's decision to Appeals Council, and does not require prior "issue exhaustion" of every issue

subsequently raised in district court); <u>see also</u> <u>Kokal v. Massanari</u>, 163 F. Supp. 2d 1122, 1129 n.4 (N.D. Cal. Sept. 18, 2001) (district court may review new issue that was not presented to Appeals Council where issue is only a legal issue that may be decided on the record that was before the Appeals Council (citing, <u>inter alia</u>, <u>Sims</u>, 530 U.S. at 107)).

Rather, remand for consideration of new evidence that was not submitted to the Appeals Council before it issued its decision affirming an ALJ's determination may be appropriate if a claimant presents evidence that is "material" to determining disability, and if there is "good cause" for the failure to produce the evidence earlier. <u>See</u> <u>Wainwright v. Sec'y of Health & Human Servs.</u>, 939 F.2d 680, 682 (9th Cir. 1991) (discussing case where new evidence became available after denial of claim became final due to recent advances in medical technology (citing <u>Embry v. Bowen</u> 849 F.2d 418, 423 (1988) and 42 U.S.C. § 405(g) (1988)). To meet the "materiality" standard, the new or additional evidence must bear "directly and substantially" on the matter in dispute. <u>Wainwright</u>, 939 F.2d at 682 (citing <u>Ward v. Schweiker,</u> 686 F.2d 762, 764 (9th Cir.1982)). Stated differently, new evidence is material is there is a reasonable probability that the evidence would have changed the outcome of the case. <u>See</u> <u>Booz v. Sec'y of Health and Human Svcs.</u>, 734 F.2d 1378, 1380-81 (9th Cir. 1984) (noting that Congress amended Social Security law in 1980 to add "stricter" statutory standard for showing of materiality). "Good cause" may be shown where the new evidence was unavailable earlier and could not be produced by the claimant and considered by the Agency before the decision denying the claimant's application became final. <u>See</u> <u>Wainwright</u>, 939 F.2d at 682 (citing <u>Embry</u>, 849 F.2d at 423-34). However, a claimant does not meet the "good cause" requirement simply by obtaining more favorable evidence after his claim has been denied. <u>See</u> <u>Wainwright</u>, 939 F.2d at 682 (citing <u>Clem v. Sullivan</u>, 894 F.2d 328, 332 (9th Cir. 1990)).

Here, Plaintiff has not shown "good cause" for her failure to raise this issue and present these numbers to the Appeals Council. The Court is not aware that anywhere in the Amended Joint Submission has Plaintiff addressed the "good cause" authorities cited above, or explained why this issue and these numbers were not raised earlier. In the Court's view, a remand should not be so easily obtained, since it could potentially be an abuse of the appeals process.

Moreover, while the alternative job numbers that Plaintiff has proposed could potentially be "material" as they could possibly bear "directly and substantially" on the VE's testimony and the ALJ's denial at step five, the Court questions whether Plaintiff has shown that her proposed job numbers, even had good cause been shown, should be credited over the VE's job numbers.

An ALJ, relying on the VE's expertise, may take "administrative notice" of "reliable job information" that is available from a non-exclusive list of "various governmental and other publications" set forth in the regulations, including: (1) the Dictionary of Occupational Titles; (2) County Business Patterns (a publication of the Census Bureau); (3) Census Reports; (4) Occupational Analyses (prepared for the SSA by various State employments agencies); and (5) the Occupational Outlook Handbook, (published by the Bureau of Labor Statistic). See 20 C.F.R. § 404.1566(d). See also Bayliss, 427 F.3d at 1218 ("An ALJ may take administrative notice of any reliable job information, including information provided by a VE.") (citation omitted).

Plaintiff states that "[a]ccording to the Department of Labor Statistics, both the laundry worker and warehouse worker occupations are contained within a census group including 553 specialty occupations (unique DOT codes) and that the total number of occupations in the national economy for all 553 unique DOT codes is 419,840." (Pl.'s Am. J. Subm. at 10.) In support of that assertion, Plaintiff cites "Exhibit A, page 4 and Exhibit B, page 5" which are attached to the Amended Joint Submission. (See id.) Plaintiff states that "approximately 25% of

these occupations are performed on a part time basis reducing the total number of full time occupations for all 553 unique DOT codes to approximately 315,000." (Pl.'s Am. J. Subm. at 10-11.)

However, the Court's review of page of four of Exhibit A, and page five of Exhibit B, does not reveal any mention of "553 specialty occupations" or "419,840" total occupations on either page. (See Am. J. Subm., Exh. A at 4 [Dkt. No. 22-14]; Exh. B at 5 [Dkt. No. 22-2 at 5].) Plaintiff's analysis apparently leaves it to the Court to figure out how and where to confirm the accuracy of the "553 specialty occupations" and "419,840 total occupations" numbers, assumedly from the other sources cited by Plaintiff such as the U.S. Department of Labor Statistics or the "Job Browser by Skill TRAN" resource. (See Pl.'s Am. J. Subm. at 10.)[3] The Court also notes Plaintiff's arguments regarding Exhibit C, which suggests an approximately 20% erosion due to part-time positions for the "hand packer" job (see Am. J. Subm., Exh. C at 8 [Dkt. No. 22-3 at 8]), but that would still leave 328,000 full-time jobs out of the VE's total number of 410,000 jobs. In sum, the numbers for each of the three jobs that would remain even after part-time jobs are excluded far exceed the 25,000 jobs that the Ninth Circuit in Gutierrez found significant for national purposes. See Gutierrez, 740 F.3d at 529.

---

[3] The Court does note that page 5 of Exhibit B, the page cited by Plaintiff, sets forth an "estimated percentage of employment" that states "full-time 75.3%" and "part-time 24.7%," although it is unclear from that page alone if the percentages correspond to the same DOT code referenced by the VE. However, if the percentages do relate to the same job, which is presumably why Plaintiff proffers the exhibit, even accepting that the VE's job numbers should be eroded by approximately 25% because they include part-time jobs, that would still leave approximately 283,500 warehouse worker jobs in the national economy, which is a "significant" number. See, e.g., Gutierrez, 740 F.3d at 529 (stating that Ninth Circuit has "never set out a bright-line rule for what constitute a 'significant number' of jobs"; and finding that 25,000 jobs in national economy qualifies as "significant" number). Although Plaintiff asserts that the numbers for the "laundry worker" should be similarly eroded by 25% because they contain part-time positions, Exhibit A here does not appear to explicitly suggest such erosion.

Plaintiff apparently argues that information from the Department of Labor Statistics, and figures generated by "Job Browser Pro / Skilltran," would show the number of "unique specialty occupations" within each of these DOT job descriptions, and if the total number of full-time jobs for each occupation were divided by the number of included specialty occupations, the remaining national numbers for each job would no longer be "significant." "Job Browser Pro" is apparently a "DOT-based software" program available on the "SkillTRAN" website that charges users a fee for access to various online job numbers and resources. <u>See</u>, <u>e.g.</u>, http://www.skilltran.com/indExh.php/ products/pc-based-solutions/job-browser-pro (2017). The Court does not have unique access to Job Browser Pro, and Plaintiff has not pointed the Court to clear evidence from the Department of Labor Statistics. Depositing with this Court three new "exhibits," containing 17 pages of unauthenticated data from 2012, rather than using the information to question the VE before the ALJ or providing the information to the Appeals Council, is, at a minimum, not the best practice. Plaintiff has not convinced the Court that "unique specialty occupations" within each of the three jobs posited by the VE erode the job numbers to the point that they are not "significant," even if Plaintiff had shown good cause for failing to provide the alleged data to the ALJ or the Appeals Council.

Taken together, in addition to failing to show "good cause," the Court finds that Plaintiff has not shown that the alternative job numbers that Plaintiff has proposed are "material" enough to warrant a remand for further consideration of the proposed new evidence.

## V.

## CONCLUSION

For the reasons stated above,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED, and Judgment shall be so ENTERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on the respective counsel for Plaintiff and Defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:   August 10, 2017

JOHN D. EARLY
United States Magistrate Judge